Approved: *Ehanft*                    **17 MAG . 7820**
          MICAHEL MCGINNIS/ELIZABETH HANFT
          Assistant United States Attorneys

Before:   THE HONORABLE SARAH NETBURN
          United States Magistrate Judge
          Southern District of New York

```
- - - - - - - - - - - - - - - - x
                                :    COMPLAINT
UNITED STATES OF AMERICA        :
                                :    Violations of
        - v. -                  :    21 U.S.C. § 846; 18
                                :    U.S.C.
KEVIN WATSON, a/k/a "Buff,"     :    §§ 924(c)(1)(A)(i)
                                :    and 2
            Defendant.          :
                                :    COUNTY OF OFFENSE:
- - - - - - - - - - - - - - - - x    NEW YORK
```

SOUTHERN DISTRICT OF NEW YORK, ss.:

      KENNETH R. McGRAIL, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"), and charges as follows:

### COUNT ONE

      1.   From at least in or about September 2017 up to and including the present, in the Southern District of New York and elsewhere, KEVIN WATSON, a/k/a "Buff," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

      2.   It was a part and an object of the conspiracy that KEVIN WATSON, a/k/a "Buff," the defendant, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1).

      3.   The controlled substance that KEVIN WATSON, a/k/a "Buff," the defendant, conspired to distribute and possess with intent to distribute was oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section

841(b)(1)(C).

(Title 21, United States Code, Section 846.)

COUNT TWO

4.      On or about October 16, 2017, in the Southern District of New York and elsewhere, KEVIN WATSON, a/k/a "Buff," the defendant, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, namely, the narcotics offense charged in Count One of this Complaint, knowingly did use and carry a firearm, and in furtherance of such narcotics offense, did possess a firearm, and did aid and abet the use, carrying, and possession of a firearm.

(Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5.      I am a Special Agent with the DEA and have been so employed for approximately three years.  I have been involved in the investigation of the above-described offense.  The information contained in this Complaint is based upon my personal knowledge and participation in this investigation, as well as on my conversations with other law enforcement agents and my examination of reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.  Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

6.      Based on my participation in this investigation, including my conversations with other law enforcement agents and my review of reports and records, I have learned the following, in substance and in part:

    a.  On or about September 28, 2017, the Honorable Loretta A. Preska, United States District Judge for the Southern District of New York, signed an order (the "September 28 Order") authorizing the interception of wire and electronic communications occurring over a cellphone used by KEVIN WATSON,

a/k/a "Buff," the defendant. Interception pursuant to the September 28 Order began on or about September 28, 2017.

   b. Based on my and other law enforcement agents' review of draft preliminary linesheets of calls and text messages intercepted pursuant to the September 28 Order, I have learned the following, in substance and in part:

      i. On or about September 28, 2017, at approximately 7:18 p.m., WATSON called a particular individual ("Individual-1"). During that call, Individual-1 told WATSON that "they ain't give me my full dosage. They gave me, uh . . . 10 and then . . . my slip didn't get through to the doctor's office man. So I'm like stuck with this bullshit man . . . . I already got a kid that called, you know, wanted but that's what I got right now, 10." WATSON responded, in substance and in part, that Individual-1 should not worry about it, and that WATSON "got this smoke for you." Individual-1 asked WATSON whether WATSON "need[ed] these," to which WATSON responded, "Nah, I don't want those."

      ii. Based on my training, experience, and participation in this investigation, I believe that, during this call, Individual-1 was telling WATSON that a doctor or pharmacist had not provided Individual-1 with a "full dosage" but instead had given Individual-1 10-milligram pills ("10"), and that Individual-1 had an individual aside from WATSON who wanted to buy pills from him ("I already got a kid that called, you know, wanted but that's what I got right now, 10"). I further believe that Individual-1 was checking to ensure WATSON did not want to buy the "10" off of Individual-1 ("listen you don't need these right?"), and that WATSON was confirming that he did not ("Nah, I don't want those.")

      iii. On or about October 1, 2017, at approximately 2:01 p.m., an individual ("Individual-2") sent a text message to WATSON stating, "Can I see you today." At approximately 2:07 p.m., WATSON sent a text message to Individual-1 stating, "U gave me 89 again not around catch You the next time." At approximately 2:08 p.m., Individual-2 called WATSON and apologized, stating, "I don't know why this keep happening, but I'mma pay the difference." Individual-2 further informed WATSON, "I got that for you. And I'm sorry about that. I have to start counting behind people." WATSON responded, "Yeah, do that. All right."

3

iv. Based on my training, experience, and participation in this investigation, I believe that, during this call, Individual-2 was apologizing for providing WATSON with fewer pills than they had agreed to, reassuring WATSON that Individual-2 would pay him back ("I'mma pay the difference") and would begin counting how many pills were being provided by others to ensure that the correct amount was being provided ("I don't know why this keep happening"; "I have to start counting behind people").

v. On or about October 5, 2017, at approximately 3:21 p.m., an individual ("Individual-3") called WATSON and said, "I got 89, 20's." WATSON responded, "All right, come on, I'm right here in Jimbo's." Individual-3 responded, "All right, I'll be there . . . in 2 second," and WATSON responded "All right."

vi. Based on my training, experience, and participation in this investigation, I believe that, during this call, WATSON and Individual-3 were arranging to meet up for Individual-3 to sell WATSON 20-milligram pills of oxycodone ("20's").

vii. On or about October 11, 2017, at approximately 12:32 p.m., WATSON received a call from a particular individual ("Individual-4"). During that call, Individual-4 stated, "Yeah, Imma probably have 90 in about a hour . . . you taking them?" to which WATSON responded, "Oh . . . huh . . . what's that on . . . green?" Individual-4 replied, "The 30, yeah the 30 size," and WATSON said, "Okay, cool, hit me." At approximately 12:43 p.m., Individual-4 called WATSON and said, "Yo, I got this [U/I] this n*** okay, I don't think you gonna to do this, bro. This n*** want 19 man." WATSON responded, "What's that?" and Individual-4 stated, "He said, 19.50." Individual-4 asked, "What the most you'll give him?" and WATSON responded, "I'll do like, maybe like, you know, we come down to maybe like half a point or a point and half." Individual-4 asked, "For 19" and WATSON said, "We might do that."

viii. Based on my training, experience, and participation in this investigation, I believe that, during this call, Individual-4 was offering to sell WATSON 90 pills ("Imma probably have 90 in about a hour . . . you taking them?) of 30-milligram doses of oxycodone ("the 30 size"), but subsequently called WATSON back to inform him that the individual from whom he was expecting them was selling them for "19" or "19.50," and

4

to inquire about the maximum price WATSON would pay for them ("What the most you'll give him?")

        ix.    On or about October 14, 2017, at approximately 11:52 a.m., WATSON received a text message from a particular individual ("Individual-5") that stated, "Sorry to bother you bro, the s*** you gave me the other day , , , it's fire Kev . . . if you have anymore to give up for some cash that would be appreciated . . . . . . .it's the real s*** . . . . . if not no problem. . . . have a good day . . ."

        x.    Based on my training, experience, and participation in this investigation, I believe that, in this message, Individual-5 was informing WATSON that the narcotics which WATSON had given him previously ("the s*** you gave me the other day" were strong or of particularly high quality ("it's fire"; "it's the real s***"), and was asking if WATSON could sell him more ("if you have anymore to give up for some cash that would be appreciated").

    7.    Based on my participation in this investigation, including my conversations with other law enforcement agents and my review of reports and records, I have learned the following, in substance and in part:

    a.    On or about October 16, 2017, law enforcement agents conducted a traffic stop of KEVIN WATSON, a/k/a "Buff, the defendant.

    b.    After arresting WATSON, law enforcement agents found, among other things:

        i. Approximately 162 20-milligram tablets of oxycodone, concealed inside a brown paper bag, in WATSON's jacket pocket; and

        ii. a silver-colored .380 caliber semi-automatic firearm, with a black magazine and seven .380 caliber bullets, located in the trunk of the vehicle in which WATSON had been driving (the "Vehicle").

    8.    Based on my participation in this investigation, including my conversations with other law enforcement agents and my review of reports and records, I have learned the following, in substance and in part:

a. On or about October 20, 2017, law enforcement agents observed KEVIN WATSON, a/k/a "Buff," and another individual enter the Vehicle. Law enforcement agents subsequently conducted a traffic stop of the Vehicle and arrested WATSON.

b. Law enforcement agents recovered approximately several thousand dollars in cash on WATSON's person.

c. Law enforcement agents searched the Vehicle and found, among other things:

i. an orange prescription bottle with no label, containing between approximately four to five crushed pills that agents believed, based on their training, experience, and participation in this investigation, to be oxycodone; and

ii. an empty prescription bottle in the name of another individual.

9. Based on my participation in this investigation, including my conversations with other law enforcement agents and my review of reports and records, I have learned the following, in substance and in part:

a. On or about October 20, 2017, law enforcement agents arrived at an apartment located in a building at 935 163rd Street in the Bronx, New York (the "Apartment") that KEVIN WATSON, a/k/a "Buff," has listed as his address on a prescription maintained by the Bureau of Narcotics Enforcement with the New York State Department of Health and which law enforcement agents believe, based on surveillance and law enforcement databases, is WATSON's residence.

b. After agents arrived at the Apartment, an individual believed, based on telephone subscriber information and interceptions pursuant to the September 28 Order, to reside with WATSON at the Apartment provided law enforcement with verbal and written consent to search the Apartment.

c. Law enforcement agents subsequently conducted a search of the Apartment, and found, among other things, the following:

i. Multiple false identification cards in the names of other individuals depicting WATSON in the photograph;

        ii. Several empty prescription bottles, including prescription bottles in the names of other individuals;

        iii. At least two prescription bottles containing pills that law enforcement agents recognized, based on their training, experience, and participation in this investigation, to be oxycodone, each with approximately 120 30-milligram pills; and

        iv. At least approximately two additional prescription bottles, with the labels ripped off, together containing approximately 100 pills that law enforcement agents recognized, based on their training, experience, and participation in this investigation, to be oxycodone.

WHEREFORE, I respectfully request that KEVIN WATSON, the defendant, be imprisoned or bailed, as the case may be.

_____
KENNETH R. McGRAIL
Special Agent
Drug Enforcement Administration

Sworn to before me this
20th day of October 2017

_____
THE HONORABLE SARAH NETBURN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK